# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

**PERRY JACKSON**                                                                        **PETITIONER**

**V.**                                            **NO. 4:15-CV-28-DMB-JMV**

**REGINALD BYRD and ATTORNEY**
**GENERAL OF THE STATE OF**
**MISSISSIPPI**                                                               **RESPONDENTS**

## MEMORANDUM OPINION AND ORDER

Before the Court is Reginald Byrd's petition for a writ of habeas corpus. Doc #1.

**I**
**Procedural History**

On or about March 12, 2015, Perry Jackson filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Mississippi. Doc. #1. After reviewing the petition, United States Magistrate Judge Jane M. Virden ordered the Attorney General of the State of Mississippi and Reginald Byrd (collectively, "Respondents") to answer the petition no later than July 21, 2015. Doc. #9. Before Respondents could file an answer to the petition, Jackson filed a "Motion for Leave to File Supplemental Brief to Petition for Relief under 28 U.S.C. § 2254," Doc. #12; which was granted on May 15, 2015, Doc. #13. On August 19, 2015, Respondents filed a response to the petition. Doc. #16. On or about September 3, 2015, Jackson filed a traverse. Doc. #20.

**II**
**Discussion**

Jackson's petition, as amended, asserts four grounds for relief: (1) the trial court failed to order a mental evaluation; (2) his counsel was ineffective; (3) the trial court wrongly admitted a confession; and (4) his convictions violated the Double Jeopardy Clause.

## A. Ground One: Failure by Trial Court to Order Mental Evaluation

Jackson first argues that the trial court's decision not to order a mental evaluation to determine his culpability for committing the crimes or his competency to stand trial violated his right to due process under the law.[1] This claim for relief is without substantive merit.

### 1. Competency examination

"The trial and conviction of a defendant while he is mentally incompetent constitute a denial of due process." *Carter v. Johnson*, 131 F.3d 452, 459 (5th Cir. 1997). Accordingly, "[s]tate procedures must be adequate to insure the right to be tried while competent." *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980). To this end, a trial "court must sua sponte conduct an inquiry into a defendant's mental capacity if the evidence raises a bona fide doubt as to the defendant's competency [to stand trial]." *Id*. "In determining whether a competency hearing is required, a trial court should give particular consideration to (1) the existence of a history of irrational behavior; (2) the defendant's bearing and demeanor at the time of trial; and (3) prior medical opinions." *Enriquez v. Procunier*, 752 F.2d 111, 113 (5th Cir. 1984).

Jackson offers as proof of the need for such an examination: (1) records from a doctor's visit that took place during his pretrial detention; (2) statements from friends and family members that his family had a history of mental illness and that he was a veteran of the war in Iraq; (3) defense counsel's motion seeking a continuance "to have the defendant tested before proceeding with this case;" (4) the trial court's order granting the motion for continuance; (5) psychiatric records for a person named "Brenda D. Thornton;" and (6) another motion by defense counsel for a continuance, in part to procure testimony from a Veteran's Administration psychologist

---

[1] To the extent, though less than clear, it appears Jackson also argues that an evaluation would have bolstered his case regarding mitigation, such argument is moot as the jury did not impose the death penalty.

"regarding possible mitigation testimony." Doc. #17-12 at 61–76. None of this evidence is sufficient to warrant a competency examination, especially in light of Jackson's actions during the crime itself, as well as his participation in his criminal defense.

Though Jackson states that the doctor's records reveal that he was having psychological problems and had made a suicide attempt during pretrial detention, those records do not support such conclusion. Instead, the doctor's assessment shows that Jackson suffered from "[a]ltered mental status with vomiting and tachycardia with hypotension and hyperglycemia and leukocytosis with a left shift and lactic acidosis – probable sepsis;" *id*. at 68; that he had lost a great deal of weight and, once admitted to the hospital, was sedated and placed on a ventilator, *id*.; that after evaluation, he was placed on sepsis protocol, sliding scale insulin, and IV antibiotics, *id*. at 66; and that he then recovered. Thus, during this visit and subsequent treatment, Jackson was not evaluated or treated for mental illness but – based upon the diagnosis of sepsis and administration of antibiotics – for infection. Statements from friends and family regarding a familial history of mental illness do not establish that Jackson himself suffered from a mental illness. Likewise, mental health records of another person have nothing to do with Jackson's competency to stand trial.

The motions seeking a continuance and the court's order granting such do not constitute evidence that Jackson was mentally ill. The first motion for a continuance shows only that counsel considered having Jackson "tested," *id*. at 61; and the other motion seeks a continuance, in part, to procure mental health records to offer in mitigation during the penalty phase of the trial, *id*. at 76. As noted above, the jury did not impose the death penalty in this case; thus, the mitigation issue is moot. Additionally, as discussed below, the evidence available to defense counsel at the time tended to show that Jackson was legally sane when he committed the crimes and was competent

to stand trial.

In sum, no facts in the record might have led the trial court to question Jackson's competency to stand trial; there was no "information which, objectively considered, should reasonably have raised a doubt about [the] defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Lokos*, 625 F.2d at 1261. Indeed, even now, Jackson has provided no evidence suggesting that he was incompetent to stand trial. This ground for relief is without substantive merit and will be denied.

### 2. Culpability examination

With regard to Jackson's arguments regarding a need for a culpability examination, a trial court must appoint "a psychiatrist for an indigent defendant if a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial and, in the context of a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness." *Woodward v. Epps*, 580 F.3d 318, 331 (5th Cir. 2009).

Here, Jackson has pointed to no evidence presented to the trial court which would have suggested that his sanity at the time of the offense would be a significant factor at trial. Additionally, it does not appear that the State presented psychiatric evidence of the defendant's future dangerousness. Accordingly, Jackson was not entitled to a psychiatric examination. *See, e.g., Nixon v. Epps*, 111 F. App'x 237, 251 (5th Cir. 2004) ("Nixon presented no evidence to the trial court that his sanity at the time of the offense would be a significant factor at trial nor did the state present psychiatric evidence at the sentencing phase.").

### B. Ground Two: Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466

U.S. 668 (1984), which requires that a petitioner "show both that counsel rendered deficient performance and that counsel's actions resulted in actual prejudice." *Rhoades v. Davis*, 852 F.3d 422, 431 (5th Cir. 2017). To establish deficient performance, a petitioner must show that, "in light of the circumstances as they appeared at the time of the conduct, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms." *Id*. at 431–32 (internal quotation marks omitted). To demonstrate prejudice, a petitioner must show "counsel's deficient performance was so serious as to deprive him of a fair trial, a trial whose result is reliable. This requires the showing of a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id*. at 432 (internal alterations, quotation marks, and footnotes omitted).

On habeas review, the issue for the reviewing court is not whether the *Strickland* standard is met but rather whether the state court's decision that *Strickland* was not met warrants relief under AEDPA standards. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, when a *Strickland* claim has been rejected on its merits by a state court, a petitioner "must demonstrate that it was necessarily unreasonable for the [state] Supreme Court" to rule as it did in order to obtain federal habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

As explained above, Jackson argues that his counsel was ineffective because he failed to: (1) have a mental evaluation conducted; (2) interview and subpoena witnesses at suppression hearing; (3) adequately prepare for trial by reviewing the crime scene and police reports; (4) obtain an expert witness in firearm trajectory, latent fingerprints, and psychology; (5) inform the trial court of his alleged suicide attempt; (6) adequately cross-examine witnesses; and (7) file a motion

seeking disclosure of promises made to "codefendants."

### 1. Failure to obtain mental evaluation

For the reasons set forth in the discussion of Ground One (the trial court's failure to order a mental evaluation), Jackson did not need a mental evaluation. Inasmuch as there is no merit to his claim that he should have had a competency hearing, Jackson cannot sustain an ineffective assistance of counsel claim based on his counsel's failure to seek one. *See, e.g, Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) (noting where underlying issue is without merit, ineffective assistance claim must fail).

### 2. Failure to interview and subpoena witnesses

"A defendant may show counsel's assistance was deficient if the attorney failed to make a reasonable investigation into the case before trial. Counsel must, at a minimum, interview potential witnesses and make an independent investigation of the facts and circumstances in the case." *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013) (citations, quotation marks, and ellipses omitted). However, a petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). Similarly, "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Sayre v. Anderson*, 238 F.3d 631, 635–36 (5th Cir. 2001) (quotation marks omitted). Thus, a petitioner is required to "demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

Jackson argues that trial counsel failed to interview and subpoena "Arkansas officials" to

6

testify at a hearing on a motion to suppress his confession. Doc. #3 at 13. He also argues that counsel should have subpoenaed Rosetta Williams regarding a statement she took from Eugene Pearson. *Id*. at 13–14. Finally, Jackson contends his counsel failed to interview the state's witnesses.

### a. Arkansas officials

During trial, the court heard a proffer of testimony regarding Jackson's statement to law enforcement. Doc. #17-7 at 367. Jackson argues that trial counsel gave ineffective assistance at this hearing by failing to call unidentified Arkansas officials to testify regarding whether he requested counsel before waiving his *Miranda* rights and giving an incriminating statement to Mississippi law enforcement officers. Jackson has not identified the Arkansas officers trial counsel should have called to testify – or what those witnesses would have stated under oath. In the absence of such evidence, Jackson's argument must be rejected.

### b. Rosetta Williams

Jackson also argues that trial counsel should have subpoenaed and interviewed Sergeant Rosetta Williams regarding an offense report she filed. Doc. #3 at 28–29, 132. In that report, Williams states that she responded to the home where Pearson was waiting for the ambulance. *Id*. at 132. Williams reported that Pearson told her that Jackson shot him in the face while he was in the bed, and he feigned death. *Id*. When Jackson left the bedroom, Pearson stated that he climbed out the window and was shot in the shoulder while he was running away. *Id*. Williams also noted that "Mr. Pearson stated someone need[ed] to go to the house because [Jackson] is shooting up people down [there]." *Id*.

Jackson argues that counsel could have used this information to impeach Pearson's testimony at trial. Pearson testified at trial that Jackson shot him in the face and arm while they

7

fought on his bed. Doc. #17-5 at 90–91. Pearson also testified that he played dead, and Jackson moved into the hall where he held Clarissa King at gunpoint. *Id*. at 91–92. At that point, Pearson climbed out the window and ran for help. *Id*. at 93. Pearson testified that "as I was going out the house, I heard [a] shot." *Id*. Jackson further argues that trial counsel could have discredited Pearson's testimony that he saw Jackson holding King at gunpoint by contrasting that testimony with his statement to Williams about when he was shot in the arm and whether he heard another gunshot.

To the extent Jackson faults his attorney for failing to interview Williams, he has offered no evidence or argument as to what an interview would have accomplished. To the extent Jackson challenges the decision not to call Williams for the purpose of challenging Pearson's account, such argument must be rejected.

Also, minor discrepancies in a witness' account ordinarily will not satisfy the prejudice required under *Strickland*. See *Jones v. Cain*, 227 F.3d 228, 230–31 (5th Cir. 2000) (counsel not ineffective for failing to impeach when "alleged discrepancies between the testimony of witnesses and data in the police report approach inanity"). Furthermore, a court "must be highly deferential of counsel's conduct and maintain a strong presumption that counsel's trial strategy fell within the wide range of reasonable professional assistance." *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011). In this regard, the Fifth Circuit has "consistently found counsel's decisions regarding examination and presentation of witnesses and testimony to fall within this category of trial strategy which enjoys a strong presumption of effectiveness." *Id*.

Here, Pearson, a sympathetic witness who miraculously survived a gunshot to the face, told the jury about the entire harrowing ordeal, including his bloody flight to a neighbor's house. He gave his statement to Williams – while still bleeding at the neighbor's house, under tremendous

8

physical and emotional stress. He told Williams that Jackson was the man who attacked him and that he was "shooting up people" at Florida King's house. Doc. #3 at 132.

The Court will not second guess trial counsel's decision not to invite Pearson to repeat the details of the crime to the jury. Counsel could have achieved virtually nothing by pinning down when and where, precisely, after Jackson shot Pearson in the face, did he then shoot him in the arm – or when he heard another gunshot. The written report included the statement that Jackson was "shooting up people" at the very time Pearson spoke to Williams. *Id*. Counsel was constitutionally effective with regard to his choice not to subpoena Williams, whose testimony would likely have been far more damaging than helpful. *See Pape*, 645 F.3d at 290 (no error in failing to impeach witness where impeachment would have done more harm than good).

### c. State witnesses

Jackson also argues that trial counsel did not adequately interview the State's witnesses. Doc. #3 at 28. He has not, however, offered any evidence to support this allegation.[2]

### 3. Failure to review crime scene and police reports

Jackson alleges that trial counsel was not adequately prepared for trial because he did not familiarize himself with the crime scene or police reports. However, counsel filed subpoenas duces tecum requiring the production of a copy of all police reports regarding the various witnesses in the case, as well as other aspects of the case. In any event, Jackson offers no proof that trial counsel failed to prepare, and a review of the trial transcript shows that counsel was familiar with the facts of the case and defended Jackson well, given the evidence the State had marshaled against him. Conclusory allegations such as these cannot support a claim for federal habeas corpus relief.

---

[2] In his supplement, Jackson points to testimony showing an apparent conflict between testimony that he exited a certain window and testimony that officers removed the screen from the window when they arrived at the scene. However, this evidence of the intact screen was provided on cross-examination in a response to Jackson's counsel's question. It is unclear what more his counsel could have done.

9

#### 4. Failure to obtain certain experts

Jackson argues that trial counsel provided ineffective assistance for failing to obtain a ballistics expert, fingerprint expert, and psychologist.

##### a. Ballistics expert

Jackson has not stated how a ballistics expert might have bolstered his defense. First, the State did not call a ballistics expert; thus, Jackson had no need to rebut such testimony. Indeed, ballistics was not an issue in the case. Florida King testified that, shortly after she and Jackson divorced, he threatened to kill her fiancé, Pearson. Doc. #17-5 at 135–37. About a week before the crimes, Jackson brought to Florida's home some clear packing tape and placed it in her laundry room. Doc. #17-6 at 152–53. Jackson later used that tape to bind the murder victims; he directed the husband and wife through the house to the laundry room (where he knew the tape was located) and forced them at gunpoint to bind each other. Doc. #17-8 at 507. Bennie Frazier testified that, the morning of the murders, Jackson asked him for a ride to a spot near Florida's home to "scare" her. Doc. #17-6 at 217–18. Pearson testified that Jackson shot him in the face and arm as he lay in bed. Doc. #17-5 at 90–91. A neighbor, Magdalene Chillis, saw Jackson walking through her yard after leaving the scene by exiting King's house through a window. *Id*. at 121–24. Jackson confessed to two people—his uncle Charles Jackson and his son Joseph Sanders—as he fled to Arkansas. Doc. #17-6 at 277–80; Doc. #17-7 at 303, 312. He also confessed to law enforcement officers, Sergeants Delando Wilson and Michael Merchant, once he was apprehended and transported back to Greenville, Mississippi. Doc. #17-8 at 490, 502–12. There was simply no need to resort to ballistics to ascertain who committed the murders and aggravated assault, as evidence of Jackson's guilt was overwhelming, including his confession and multiple acts of premeditation beginning a week before the murders and assault.

*b. Fingerprint expert*

Similarly, though the State called an expert in latent fingerprints, Shannon Roy, she provided no fingerprint evidence linking Jackson to the crimes. Doc. #17-7 at 342–43. Further, Jackson told investigators that he wore gloves during the crimes, which would eliminate the possibility of recovering useable fingerprints at the scene which could be compared to either a suspect or entries in a fingerprint database. *Id*.at 348; Doc. #17-8 at 513. In short, the evidence in this case overwhelmingly pointed to Jackson as the person who committed the crimes. For these reasons, an expert in latent fingerprints would not have assisted Jackson's defense.

*c. Psychologist*

Finally, as explained in detail in the discussion of Ground One (failure of the trial court to order a psychological evaluation), defense counsel had no reason to obtain an expert to conduct a psychological evaluation of Jackson, except perhaps to support an argument mitigating against imposition of the death penalty. As the jury did not impose the death penalty, Jackson suffered no legal harm from his counsel's decision not to obtain an expert in psychology. This ground for relief is without merit.

**5. Failure to inform trial court of alleged suicide attempt**

As discussed in detail above regarding Ground One, there is no evidence that Jackson attempted suicide. Though he was transported to the hospital and treated there, he was diagnosed and treated for a serious infection, not for mental health problems or self-inflicted injuries. Accordingly, his counsel could not have informed the trial court of such an event. This ground for relief is therefore without substantive merit.

**6. Failure to adequately cross-examine witnesses**

Jackson argues that his trial counsel failed to cross-examine Pearson regarding his

statement to police (in which he said he was shot in the arm while in his bedroom) and his trial testimony (in which he said that he was shot in the arm after he escaped through the window). Doc. #3 at 28. As discussed above, counsel decided not to revisit Pearson's devastating testimony that (1) Jackson had shot him in the face and arm, (2) Jackson had confronted the others in the house, forcing them into the laundry room, and (3) Jackson was "shooting up people" in the house. Jackson's counsel was constitutionally effective in making this strategic decision. *Id*. at 132.

### 7. Failure to seek disclosure of promises made to "co-defendants"

Jackson argues that trial counsel rendered ineffective assistance because he failed to file a motion seeking disclosure of any promises made to his "co-defendants." *Id*. at 29. As Jackson was tried individually, he had no "co-defendants;" however, it appears he is referring to his relatives who were questioned by police during the investigation. Frazier, Jackson's cousin who dropped him off near the scene of the shootings, testified that he was arrested after the shootings and gave a statement to law enforcement. Doc. #17-6 at 223–24. Similarly, Charles Jackson, Jackson's uncle who arranged his ride to Arkansas following the shootings, was separately charged for his role in the events of this case. *Id*. at 287. Charles Jackson also testified that he was going to jail for his role in this matter. *Id*. at 297. Joseph Sanders, Jackson's cousin who drove him to Arkansas, was also charged. Doc. #17-7 at 315. Sanders testified that he had been indicted on charges related to this case and had a pending criminal case. *Id*.

The State's "Response to Defendant's Motion for Discovery" reveals that "[t]he defendant has been given a copy of the contents of the District Attorney's file." Doc. #17-1 at 34. Thus, if such agreements with these witnesses existed, Jackson's counsel requested them. Furthermore, even if his counsel had not requested the relevant documents, Jackson cannot show prejudice arising from this failure because there is no evidence that the agreements actually existed.

12

Accordingly, Jackson has not demonstrated that trial counsel was constitutionally ineffective with regard to this claim.

### C. Ground Three: Admission of Jackson's Statement to Law Enforcement

Jackson also argues the trial court's admission of a statement he made to law enforcement violated his *Miranda* rights.

> *Miranda v. Arizona*, 384 U.S. 436 (1966),
>
> requires that prior to a custodial interrogation an accused person must be warned: (1) that he has a right to remain silent; (2) that any statement he makes can and will be used as evidence against him in court; (3) that he has a right to consult with counsel prior to questioning; (4) that he has a right to have counsel present during any questioning; and (5) that if he cannot afford an attorney a lawyer will be appointed to represent him. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to invoke any of these rights, the interrogation must cease.

*Garcia v. Stephens*, 793 F.3d 513, 520–21 (5th Cir. 2015) (quotation marks, footnotes, and alterations omitted). "[S]tatements made during a custodial interrogation are inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived Miranda rights' when making the statement." *Id*. at 521 (quotation marks and alterations omitted). The knowing and voluntary inquiry asks whether, under the totality of the circumstances, the waiver was "the product of free and deliberate choice rather than intimidation, coercion, or deception" and whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

Jackson filed a pretrial motion to suppress the confession he made to law enforcement officers. Doc. #17-1 at 129. At trial, the court heard a proffer of testimony in order to determine the admissibility of Jackson's statement. Doc. #17-7 at 367. Greenville Police Department Investigator Wilson testified that he and Captain Kaho brought Jackson back to Mississippi from Arkansas, at which point they read him his *Miranda* rights. *Id*. at 369–70. The State introduced

Jackson's *Miranda* form as Exhibit S-82 and his recorded statement as Exhibit S-83. *Id*. at 371–72. Greenville Police Sergeant Merchant testified that he was present during Jackson's interrogation in Greenville. *Id*. at 381. He verified that Jackson had received *Miranda* warnings, and testified that Jackson never requested an attorney. *Id*. at 381, 383.

Jackson testified that he had told law enforcement officers in Arkansas that he wanted to speak to an attorney. *Id*. at 392. Jackson said that he made this request of "[t]wo black females" with the "sheriff['s] department over in Pine Bluff," but he did not know their names and could not describe them. *Id*. at 395. Jackson also claimed that he asked Wilson for an attorney when he traveled to Arkansas to take photos of Jackson, the day before he was transported back to Mississippi. *Id*. at 393. Wilson, however, testified that Jackson did not request a lawyer while he was there to take the photographs. *Id*. at 402.

Jackson offered only his testimony at a suppression hearing held during trial to support his allegation that he had requested an attorney while detained in Arkansas. *Id*. at 391–400. That testimony provided almost no detail (he could not even describe the Arkansas officers) – and was contradicted by the *Miranda* waiver, his behavior during the taped interview (*e.g.*, freely offering a detailed description of the crime), and the testimony of the Mississippi law enforcement officers involved. Accordingly, the state court's finding that this claim was without merit was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor did the decision involve an unreasonable determination of the facts in light of the evidence. Jackson's claim for habeas corpus relief based on his allegation in Ground Three is without merit and will be denied.

### D. Ground Four: Sufficiency of Indictment

Jackson argues in Ground Four that, after his conviction for the first capital murder, his

14

conviction for the second capital murder violated the Constitution's prohibition against double jeopardy "[b]ecause the predicate of the underlying offense burglary was 'intent to assault/or kill.'" Doc. #3 at 35. The law regarding double jeopardy does not, however, operate in this fashion.

Under the Double Jeopardy Clause of the Fifth Amendment, "[n]o person shall … be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "It is well established that, whatever the sequence may be, the double jeopardy clause forbids successive prosecution and cumulative punishment for a greater and lesser included offense." *Ortega v. Stephens*, 784 F.3d 250, 252 (5th Cir. 2015) (internal quotation marks and alterations omitted). "That is because, when one offense is encompassed within another, the lesser included offense is the 'same' for purposes of double jeopardy as the greater inclusive offense…." *Id*. However, the Double Jeopardy Clause is not violated when a defendant is charged with the same crime for two separate criminal acts. *See Miller v. Turner*, 658 F.2d 348, 350–51 (5th Cir. 1981) ("The record clearly indicates that Miller killed two people with two separate criminal acts. These acts constituted two distinct violations of the Florida murder statute…. Thus, the prohibition established by the Double Jeopardy Clause against multiple punishments for the same offense has no application here.").

Here, Jackson was charged with two counts of capital murder related to two separate criminal acts (the murder of Kelly King and the murder of Clarissa King). This was proper and Jackson's contention to the contrary is rejected.

### E. Summary

Having rejected all of the grounds asserted in Jackson's petition, the petition will be denied.

### III
### Certificate of Appealability

This Court must "issue or deny a certificate of appealability when it enters a final order

adverse to the applicant." Rule 11 of the Rules Governing Section 2254 Proceedings for the United States District Courts. A certificate of appealability ("COA") will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For cases rejected on their merits, a movant seeking a COA "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Based on the *Slack* criteria, the Court finds that a COA should not issue in this case.

## IV
## Conclusion

For the reasons above, Jackson's petition for writ of habeas corpus [1] is **DENIED**. A certificate of appealability is also **DENIED**. A final judgment consistent with this opinion will issue separately.

**SO ORDERED**, this 29th day of March, 2018.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**